JUDGE LYNCH

Jeffrey A. Udell (JU0411)
OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower,
65 East 55th Street
New York, New York 10022
(212) 451-2300
*Attorneys for Plaintiff*

07 CV 4647

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BUYING TRIANGLE, LLC,<br><br>                             Plaintiff,<br><br>                -against-<br><br>INFOSYS BPO LIMITED, f/k/a Progeon Limited,<br><br>                            Defendant. | No. 07 Civ. _____<br><br>**COMPLAINT AND**<br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff The Buying Triangle, LLC, by its attorneys, Olshan Grundman Frome Rosenzweig & Wolosky LLP, for its Complaint, alleges as follows:

<u>Nature of the Case</u>

1. Pursuant to a written contract dated August 25, 2006, plaintiff The Buying Triangle, LLC ("TBT"), has paid for technology services that were to be supplied by defendant Infosys BPO Limited ("Infosys"). This action seeks recovery for defendant's flagrant breach of the parties' contract, and its wrongful "holding hostage" of the proprietary confidential information of both TBT and its clients.

<u>The Parties</u>

2. Plaintiff TBT is a Delaware limited liability company, with its principle place of business located in New York, New York. Its two members are natural persons residing in New York and Massachusetts, respectively.

537290-4

3. Infosys, upon information and belief, is a corporation organized under the laws of the country of India, with its principal place of business in that country. Upon information and belief, Infosys is registered to do business in the State of New York. Formerly known as Progeon Limited, Infosys is the business process outsourcing (BPO) subsidiary of Infosys Technologies, a publicly traded technology services company (Nasdaq: INFY), also based in India, with a market capitalization of over $31 billion.

## Jurisdiction and Venue

4. This Court has subject-matter jurisdiction over this case, pursuant to 28 U.S.C. §1332(a), because the action is between a citizen of a State and a citizen of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. The Court has personal jurisdiction over defendant Infosys, as it transacts business and supplies services in New York within the meaning of Section 302 of the New York Civil Practice Law and Rules.

6. Venue is appropriate in this District pursuant to: (i) 28 U.S.C. §1391(a), as a substantial part of the events or omissions giving rise to the claims herein occurred in this District; and (ii) 28 U.S.C. §1391(c), as Infosys "resides" in this District for purposes of venue because it is subject to personal jurisdiction here.

## Factual Allegations

A. Background

7. Plaintiff TBT uses a unique and proven methodology to identify potential savings within the procurement process of its corporate clients. In brief, TBT has created a highly refined "spending analytics" toolset that analyzes and identifies the spending

patterns of its clients. After review of those patterns, TBT recommends and then implements changes to its clients' corporate spending policies, designed to ensure that the clients receive reductions of 10% to 20% in their procurement costs. TBT's methods are secret, but unpatented.

8. The first step in TBT's work, on behalf of each client, involves a comprehensive analysis of the client's spending patterns. As TBT's clients include Global 2000 companies, the volume of data review for these clients can be massive. To accomplish this data review, TBT turned to defendant Infosys.

9. Infosys describes itself on its website as "one of the leading BPO companies in India," and claims to "combine domain knowledge, process skills and a technology heritage to offer [its] clients predictable, 'no-surprises' process outsourcing." It was this reputation -- and its status as the BPO subsidiary of the respected hi-tech giant, Infosys Technologies -- that led TBT to turn to defendant Infosys and to rely on it for the computer-based technical analysis that is critical to TBT's business. Sadly, this reliance proved disastrous for TBT.

B. The Agreement

10. On or about August 25, 2006, TBT and Infosys (then known as "Progeon Limited") entered into a letter of engagement (the "Agreement," attached hereto as Exhibit A), pursuant to which Infosys was to deliver services to TBT regarding spending analysis, and was to give support for TBT's proprietary product, known as "P2P Smart$^{SM}$." In return, TBT was to pay Infosys at a rate of between $3 and $20 per full-time-employee per hour, depending upon the nature of the work.

11. Additionally, the Agreement provided the following with respect to the parties' intellectual property rights:

> TBT retains all intellectual property rights to the processes being performed and material being created under this [Agreement] by [Infosys]. [Infosys] will respect all trademarks and rights of TBT and will not duplicate or reverse engineer any work done under this agreement without explicit permission of TBT.

12. The Agreement was issued from TBT's headquarters in New York, and provides that it is governed by the laws of this State.

13. Pursuant to the Agreement, Infosys established -- at its location in Bangalore, India -- a computer server to serve as a repository for the highly confidential spending data of TBT's respective clients, for subsequent analysis by both TBT and Infosys. In creating this server, Infosys used what is known as "file transfer protocol" or FTP, a method commonly used to transfer data from one computer to another over the Internet, or through a network.

14. There are two computers involved in an FTP transfer: a server and a client. The FTP server, running FTP server software, listens on the network for connection requests from other computers. The client computer, running FTP client software, initiates a connection to the server. Once connected, the client can do a number of file manipulation operations such as uploading files to the server, downloading files from the server, renaming files and deleting files.

15. Infosys established an FTP server with several folders -- or segregated pockets of information -- for use by TBT's respective clients. Specifically, at TBT's request, Infosys gave each TBT client access to its own unique folder in the FTP server, for the purpose of transferring enormous amounts of client data from the client's

computers to the FTP server, where that data then would be analyzed by TBT and Infosys. The specific network instruction that gave each client access to its FTP folder was provided by Infosys either: (i) to the client directly or (ii) to TBT, with the express understanding by Infosys that TBT would provide this information to the client.

16.     Confidentiality of the client's data was a paramount concern, as TBT personnel repeatedly explained to their counterparts at Infosys. Accordingly, each TBT client received a unique password and link, enabling it to upload its confidential data to the FTP server created by Infosys.

17.     Prior to the transfer of any client data, TBT invested substantial sums of money and time training Infosys personnel in TBT's unique, proprietary and confidential business processes, approach, know-how, presentations, reports and, most significantly, its service offering, known as P2P Smart$^{SM}$. Among other things, the training covered both "Invoice Review" and the creation of what TBT refers to as the "Spend Cube" -- TBT's unique and confidential process designed to obtain client-spending data (generally for accounts-payable and other vendor payment systems). Invoice Review includes the process of transforming that raw data, the types of client output required to do so, and the quality control methodology used to ensure that the work is complete. The Invoice Review process also provided access to TBT's confidential price-benchmarking with respect to several different commodities.

18.     In short, this training was costly, and involved senior TBT personnel traveling, on three occasions, from the United States to India to work with Infosys personnel. Beyond the several weeks of onsite-training, training conducted remotely via

telephone, email and web-sharing was often conducted with different Infosys team members.

C.  Infosys Breaches the Agreement

19. Plaintiff fully performed its obligations under the parties' Agreement.

20. Infosys, however, did not.

21. For one, during the course of the parties' relationship, TBT clients experienced numerous occasions when the FTP servers created by Infosys were simply "down" and therefore unusable by the clients. Indeed, between July 2006 and March 2007, there were approximately 15 different occasions in which the FTP server was unavailable to TBT, its clients or Infosys. These outages caused over 18 days of delay (an average of 2 days of delay each month) for the Infosys team in sending or receiving data, thus delaying the delivery of TBT's product to its clients and incurring extra costs for TBT. Moreover, the outages cost considerable time and frustration on the part of TBT's clients, and undermined TBT's reputation with those clients

22. Against this backdrop, on or about March 28, 2007, the employee of one TBT client discovered, to his shock and dismay, that the FTP servers established by Infosys to safeguard the client's confidential information, were not secure.

23. Specifically, the client was in the process of uploading confidential data to his unique folder on the FTP server, when suddenly the computer froze, generating an error message. When the client was given the opportunity to select a "go back" option, he did so and discovered that he could suddenly view files of a *different* TBT client. With little effort, the client soon discovered that he could successfully view, download, modify or even delete the confidential data of multiple TBT clients.

537290-4

24. The client reported this gross breach of security to TBT and, understandably concerned, inquired whether others could similarly view that client's confidential data. TBT, of course, promptly notified Infosys and demanded an explanation of *how* the FTP server designed by Infosys could so miserably fail the most basic level of security.

25. Infosys conducted its own internal investigation, during the course of which several Infosys employees admitted to TBT personnel that the reason for the breach lay in Infosys's own design of the system. Specifically, Infosys failed to create different account-user ids for each separate TBT client. In a subsequent written report, Infosys again admitted its failure, noting that its own "risk review did not flag the need for using different account user ids for different end customers of TBT."

D.  <u>Infosys Holds TBT Data Hostage</u>

26. In light of the foregoing, on or about April 6, 2007, TBT communicated to Infosys in writing that it (TBT) would terminate the parties' relationship, and consequently requested that Infosys take measures for an orderly transfer (from Infosys to TBT) of: (i) all of the confidential account data of TBT clients; and (ii) all TBT intellectual property held by Infosys.

27. Infosys responded by taking the position that unless TBT first agreed to release Infosys of all claims, Infosys would return *neither* TBT's intellectual property nor the confidential account data of TBT clients.

28. Infosys currently has retained both TBT's intellectual property and certain confidential account data of TBT clients, despite a demand by TBT for the same.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract -- Specific Performance)

29.   Plaintiff restates the allegations set forth in paragraphs 1 to 28.

30.   Plaintiff fully performed all of its obligations pursuant to the terms of the Agreement. Defendant, however, breached the Agreement in at least three ways.

31.   First, through the poor performance of its FTP servers and its failure to safeguard the confidentiality of client information stored on such servers, Infosys failed to perform its basic obligations under the Agreement in a satisfactory manner and has thus breached the Agreement.

32.   Second, Infosys breached its obligation under the Agreement to return to TBT all intellectual property of TBT. Such materials currently in the possession of Infosys include, but are not limited to:

(a)   TBT's unique, proprietary and confidential business processes, presentations, and reports, such as its P2P Smart$^{SM}$, as well as its "Invoice Review" and "Spend Cube" techniques and its confidential pricing benchmarks.

(b)   All materials worked on by the entire Infosys team during the period of training and client work (January 2006 to April 2007), including client presentations, work plans, training materials, guidelines, working documents and any other material created for or by the team during that period.

(c)   All sales and marketing materials laying out TBT's approach to Spend Analysis and P2P Smart$^{SM}$.

537290-4

(d)     Any work derived from or reverse engineered by Infosys from the materials set forth in items (a), (b) and (c) above.

33.     Third, Infosys breached its obligation under the Agreement to return to TBT all of the confidential customer information entrusted to TBT by its clients ("Confidential Client Information") and, under the Agreement, provided to Infosys.

34.     TBT has made a demand that Infosys return all of the materials described in the preceding two paragraphs, 32 and 33, with which Infosys has not complied, in violation of the Agreement.

35.     Accordingly, TBT requests judgment of specific performance against Infosys, and that this Court order the immediate return of all property wrongfully retained by the defendant.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract -- Damages)

36.     Plaintiff restates the allegations set forth in paragraphs 1 to 35.

37.     As set forth above, while TBT has fully performed its obligations under the Agreement, defendant Infosys has breached the Agreement, causing an end to the parties' relationship.

38.     By reason of the foregoing, TBT has been damaged in an amount to be determined at trial, no less than $600,000.

## THIRD CLAIM FOR RELIEF
### (Theft of Trade Secrets)

39.     Plaintiff restates the allegations set forth in paragraphs 1 to 38.

40.     As set forth above, TBT retained the services of Infosys specifically to support TBT's unique and secret methodology in the area of spending analysis, and to

support TBT's proprietary product, known as "P2P Smart$^{SM}$." For this purpose, TBT disclosed to Infosys, in confidence, TBT's secret but unpatented business processes.

41. TBT has expended a great deal of time, money and labor to develop its secret business processes, which it has not shared with persons outside of TBT. This information is not known outside of TBT, and is valuable to TBT because it is integral to TBT's business. These confidential processes constitute trade secrets owned by TBT.

42. TBT's confidential trade secrets were disclosed to Infosys in the course of the parties' relationship, and pursuant to the Agreement.

43. Under the Agreement, Infosys agreed: (i) that "TBT retains all intellectual property rights to the processes being performed and material being created under this" Agreement; and (ii) that Infosys would "respect all trademarks and rights of TBT and [] not duplicate or reverse engineer any work done under this agreement without explicit permission of TBT."

44. The business relationship between TBT and Infosys has ended.

45. Infosys has refused to return the material created and the processes developed by TBT in the course of the parties' relationship. As set forth above, this material includes, among other things, TBT's unique, proprietary and confidential business processes, approach, know-how, presentations, reports and, most significantly, its service offering, known as P2P Smart$^{SM}$. As well, it includes TBT's proprietary "Invoice Review" and "Spend Cube" techniques and TBT's confidential pricing benchmarks.

46. Moreover, Infosys has attempted to utilize TBT's unique and proprietary information for its own purposes, in breach of the Agreement and the parties' confidential

relationship and in a willful, wanton and reckless manner in disregard of TBT's rights. For example, during the course of the parties' relationship, in or about July 2006, TBT personnel discovered (while visiting Infosys on-site in Bangalore, India) a PowerPoint presentation, which apparently was to be used by Infosys to pitch spending analysis services to its own clients and prospects, such as CIBC, BP and Alcoa. This presentation contained substantial portions that were copied *verbatim* from TBT's own promotional materials. Thus, it is clear that Infosys intends to enter the procurement space occupied by TBT, supplying a motive for its wrongful refusal to return TBT's trade secrets.

47. Infosys has no right to retain or use TBT's proprietary business processes -- including, but not limited to, its spending analytics capability, its P2P Smart$^{SM}$, "Invoice Review" and "Spend Cube" techniques, and its product pricing benchmarks -- without the express approval and/or licensing of such use by TBT.

48. By refusing to return and by using TBT's intellectual property, Infosys has suffered irreparable harm, including past and future profits.

49. Plaintiff TBT has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
### (Unfair Competition)

50. Plaintiff restates the allegations set forth in paragraphs 1 to 49.

51. By misappropriating the trade secrets of plaintiff TBT, as set forth above, Infosys has acted in bad faith, and to the commercial disadvantage of TBT.

52. Upon information and belief, the business processes and methods wrongfully retained by Infosys have been used by Infosys to compete with TBT, unfairly, in the spending analysis marketplace.

53. Accordingly, Infosys has engaged in unfair competition, within the meaning of New York law.

54. Plaintiff TBT has been damaged thereby.

WHEREFORE, plaintiff respectfully requests that the Court enter judgment as follows:

    A. Awarding plaintiff specific performance under the Agreement by directing defendant to return to TBT: (i) all TBT intellectual property; and (ii) all Confidential Client Information retained by defendant.

    B. Awarding plaintiff compensatory damages in an amount to be determined at trial, no less than $600,000, plus interest thereon;

    C. Issuing a permanent injunction, enjoining defendant from using any of plaintiff's confidential trade secrets or any of the Confidential Client Information and directing defendant to return all such materials to plaintiff forthwith;

    D. Issuing an order directing defendant to account to plaintiff for all profits wrongfully diverted from plaintiff to the defendant as a result of defendant's use of plaintiff's proprietary information; and

    E. Granting such other and further relief that the Court deems just and proper, together with the costs and disbursements of this action.

## DEMAND FOR JURY TRIAL

Plaintiff TBT hereby demands a trial by jury on all issues so triable.

Dated: New, York, New York
June 1, 2007

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP

By: _____
Jeffrey A. Udell (JU0411)
Raphael Katz (RK6603)
*Attorneys for Plaintiff*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

537290-4



THE BUYING TRIANGLE, LLC
YOUR SAVINGS SOLUTION

August 25, 2006

To:

Exhibit A

Progeon Limited
Plot Nos 26/3, 26/4, 26/6 Electronics City
Hosur Road, Bangalore - 560100

Attention: Amit Sharma, Relationship Manager

Dear Amit Sharma,

THE BUYING TRIANGLE ("TBT") is pleased to select Progeon Limited ("Progeon"), an Infosys subsidiary, to provide Business Process Outsourcing services for spend data analysis and spend cube building. This letter of engagement "(LoE") is being issued in order for Progeon to commence initial operations. This LoE documents the initial terms and conditions and both parties intend to negotiate and sign a definitive master services agreement ("MSA").

The scope of work proposed under this LoE is to have Progeon deliver services to TBT that TBT will resell to customers in the area of Spend Analysis, spend cube building and support for TBT's proprietary service / product offering P2P Smart™. TBT retains all intellectual property rights to the processes being performed and material being created under this LoE by Progeon. Progeon will respect all trademarks and rights of TBT and will not duplicate or reverse engineer any work done under this agreement without explicit permission of TBT.

This LoE and all subsequent LoEs shall be subject to the terms and conditions of the MSA. Till the date of signature of the MSA, the terms of this LoE are binding on both parties.

**Fees:**

We will pay Progeon for offshore operations at the following rates (inclusive of all taxes and other fees):

| Role | Fees |
| --- | --- |
| Process Agent – When working on items that TBT will bill to clients | USD 20* per FTE per HR |
| Process Agent – Non client billable work | USD 3** per FTE per HR |

*This rate is applicable for the client project work. To be charged for the duration of a client specific spend analysis project.
**This rate is applicable for all the time when spend analytics team is not working on a client project, but extending support such as pilot work, spend analysis work estimation etc. To begin effective 01/06/2006



**THE BUYING TRIANGLE, LLC**
YOUR SAVINGS SOLUTION

You will raise invoices on us each month and we agree to pay these invoices within 30 days of receipt.

We both agree not to solicit or hire for employment (directly or indirectly or through third parties) each other's employees during the term of this LoE and for a period of one year following its completion or termination.

This LoE may be terminated by either party at its discretion by giving the other party two month's notice in writing. In the event that this LoE is terminated for any reason, including not being able to reach an agreement on the terms and conditions of the MSA, we agree to pay Progeon for services provided until termination in accordance with this LoE.

This LoE shall be governed by the laws of the State of New York in the country of the United States.

We look forward to a successful engagement between our companies.

Sincerely,

Name: Tariq A. Hassan
Title: CEO, The Buying Triangle, LLC
Tel. No: +1-212-842-2602